UNITED STATES DISTRICT COURT
*for* THE DISTRICT OF COLUMBIA
(Civil Division)

**ESTATE OF CAROLYN J. MICKENS et al.**
c/o Vivian Newman, Administrator

Plaintiff,

**Vivian Newman,** *an individual*

*on behalf of himself and all others similarly situated*

Plaintiff,

v.

**US BANK, NATIONAL ASSOCIATION**

Defendant,

**OCWEN LOAN SERVICING, LLC**

Defendant,

**BWW LAW GROUP, LLC**

Defendant.

Case No.: __________________

**CLASS ACTION COMPLAINT AND JURY DEMAND**

The Plaintiff, Vivian Newman, by and through undersigned counsel, hereby sue Defendants US Bank, National Association ("US Bank") and Ocwen Loan Servicing, LLC ("Ocwen") and BWW Law Group, LLC ("BWW"), and represents unto the Court as follows:

**PRELIMINARY STATEMENT**

1. This is an action for actual and statutory damages, costs and attorney's fees brought pursuant to the Truth In Lending Act, 15 U.S.C. §1601 et seq. ("TILA"), Real Estate Settlement Procedures Act, 12 U.S.C. §2605 et seq. ("RESPA"), Fair Debt Collection Practices Act, 15 U.S.C. §1692 et seq. ("FDCPA"), Equal Credit Opportunity Act, 15 U.S.C. 1691 et seq. ("ECOA")Mortgage Lender and Broker Act, D.C. Code §26-1101 et seq.

("MLBA") and District of Columbia Consumer Protection Procedures Act, D.C. Code §28-3901 et seq. ("CPPA")

**PARTIES, JURISDICTION AND VENUE**

2. Vivian Newman was the niece of Carolyn Mickens and she was the power of attorney for Carolyn Mickens prior to her death. Vivian Newman is the current and successor to Carolyn Mickens' daughter, Nicole Mickens, as the Personal Representative or Administrator for the Estate of Carolyn Mickens.

3. US Bank is a financial institution that invests in mortgage loans.

4. Ocwen is a loan servicer of mortgage loans, including non-performing loans. Ocwen acquires servicing rights to some mortgages that are in default at the time of transfer and proceeds to collect on those mortgages. With respect to those debts, Ocwen is a debt collector as defined by the FDCPA because it regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another and its collection activities are covered by the FDCPA.

5. BWW is a law firm specializing in the collection of mortgage debts on behalf of loan servicers and loan investors.

6. The jurisdiction of this Court arises under 15 U.S.C. § 1692k and 28 U.S.C. § 1331. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) for Plaintiffs reside in this District and the conduct complained of occurred in this District.

**FACTUAL ALLEGATIONS**

7. Ms. Newman is the personal representative of the Estate of Carolyn Mickens, who was the owner of certain real property commonly known as 5200 Ames Street, Northeast, Washington, District of Columbia (the "Property"). Carolyn Mickens passed away on September 7, 2014.

8. A Deed of Trust purporting to secure $90,100.00 against the Property was recorded in the DC Recorder of Deeds in October 1994. This Deed of Trust (the "1994 DOT") named Quality Mortgage USA, Inc. as the beneficiary.

9. Two more Deeds of Trust were executed and/or recorded in 1996. There was a Deed of Trust dated July 3, 1996 that named Nationstar Financial Services Corporation and purported to secure a $11,374.81 debt. The other Deed of Trust was dated for July 22, 1996, named Metro-Area Mortgage as the beneficiary and allegedly secured a $25,000 debt.

10. On or about March 31, 1998, another Deed of Trust was recorded against the Property. This Deed of Trust ("1998 DOT") named Nationscredit Financial Services Corporation ("Nationscredit"), was dated for March 26, 1998 and purported to secure a debt in the amount of $103,653.14.

11. At the time of the 1998 DOT, there were at least three other recorded deeds of trusts in existence. Therefore, the 1998 DOT was not considered a first or primary mortgage.

12. The purported copy of the promissory note that is allegedly secured by the 1998 DOT, states that the promissory note is not negotiable if the loan is secured by a second mortgage.

13. On or about May 5, 2009, a Certificate of Satisfaction was filed and purported to release the July 3, 1996 DOT.

14. Carolyn Mickens' husband, John Mickens, died on October 26, 2009.

15. Thereafter, Carolyn Mickens became seriously ill.

16. Ms. Newman and Carolyn's daughter (Nicole Mickens) took care of Carolyn Mickens at her home while she was sick and unable to tend to herself.

17. Both Ms. Newman and Nicole Mickens made sure Carolyn Mickens' bills were being paid and neither of them knew anything about the purported Ocwen loan.

18. In 2014, Plaintiffs paid off loan that was secured by the July 22, 1996 DOT.

19. Carolyn Mickens told Nicole Mickens and Vivian Newman that the July 22, 1996 DOT was the only debt owed on the Property.

20. Carolyn Mickens did not receive any correspondence from any other lender, including US Bank or Ocwen, regarding another loan or debt against the Property.

21. Ms. Newman did not become aware of Ocwen's purported claim against the Property until late summer or early fall of 2014 when an Ocwen representative came to the Property to perform yard maintenance.

22. After Ms. Newman confronted the individual, they engaged in a discussion that revealed the individual was sent to cut the grass by Ocwen.

23. Ms. Newman contacted Ocwen and learned that Ocwen claimed a delinquent mortgage was held against the Property.

24. Ms. Newman immediately got in touch with a house counseling agency that specialized in helping homeowners avoid foreclosure.

25. Meanwhile, Defendant BWW served a foreclosure lawsuit on Plaintiff in September 2014. The foreclosure lawsuit was filed in the District of Columbia Superior Court, styled as US Bank v. Estate of Carolyn, Case No. 405281-V. That case remains pending, and the parties are currently engaged in dispositive motion practice.

***PLAINTIFFS' APPLICATION(S) FOR LOAN MODIFICATION***

26. With the help and assistance of the house counseling agency, Ms. Newman and Carolyn Mickens submitted a loan modification application to Defendant Ocwen. The loan modification included both Carolyn Mickens' and Ms. Newman's income.

27. Ocwen dragged Carolyn Mickens and Vivian Newman through the modification process for two years before Carolyn Mickens died in October 2016.

28. At one point, in September 2015, Defendants offered Carolyn Mickens a loan modification but turned around and withdrew the offer on the claim that the offer was made in error. Carolyn Mickens was distraught by Defendants false offer to modify the loan.

29. Ocwen never modified the loan because it never intended to modify the loan. During this entire time-period that Plaintiffs applied for a modification, among other things, Ocwen required Plaintiffs to send documents that it falsely claimed it never received, falsely represented that it would fairly consider Plaintiffs for a modification, and failed to either provide written notification that Plaintiffs were denied or failed to provide specific reasons in its written notification that Plaintiffs were being denied a loan modification.

30. Upon information and belief, Ocwen falsely represented that it would consider Plaintiff for a modification because it wanted to appear that it was being fair and abiding by the federal HAMP guidelines.

31. After wasting three years trying to modify the loan, the purported debt had grown substantially through the incurrence of foreclosure fees and other expenses that could have been avoided if the Defendants would have modified the loan or if the Plaintiff had the Property sold, which would have occurred had the Defendants been truthful with Plaintiffs about the Defendants intention *not* to modify the loan.

32. Ms. Newman submitted her last modification application in or around December 2016 or January 2017.

33. By letter dated January 6, 2017, Ocwen denied Ms. Newman's loan modification application for the stated reason that the Initial Package was received after December 30, 2016 and the HAMP program was denied on December 31, 2016. Further, the letter stated a Proprietary Modification was denied because the owner of the loan does not allow modifications.

***ILLEGAL FEES AND FAILURE TO PROPERLY RESPOND TO DISPUTES AND REQUESTS FROM PLAINTIFFS***

34. After learning that Ocwen and US Bank never had any intention of modifying the loan, the Plaintiff instituted a plan to sell the Property and requested a payoff quote.

35. Ocwen issued a Payoff Quote dated 01/16/2017 that stated the debt amount was $262,233.30. This debt amount was false for it included inflated and illegal fees.

36. On or about April 24, 2017, Plaintiff sent Ocwen a letter disputing the charges and fees in the Payoff Quote. Plaintiffs' letter also requested an explanation of Ocwen's and/or US Bank's decision to deny her loan modification application in August 2015.

37. Ocwen received Plaintiffs' letter on or before May 1, 2017, but Ocwen did not acknowledge receipt of Plaintiff's letter until after May 8, 2017. Although Ocwen's letter was dated May 8, 2017, Ocwen's letter was not sent until sometime after May 8, 2017.

38. Plaintiff received a letter from Ocwen purporting to respond to Plaintiffs' April 24th inquiry. Although, Ocwen's response letter was dated June 13, 2017, Plaintiffs received the letter well after June 13, 2017. Upon information and belief, Ocwen does not mail its letters itself, but outsources the mailing to a third-party vendor that mails the letter days after the date Ocwen created the letter. Consequentially, the dates on Ocwen's letters do not represent the date that the letter was sent.

39. Ocwen's response letter claimed the loan was due for the April 2009 mortgage payment when Ocwen acquired the loan in September 2011 and that fees totaling $7,877.52 were transferred from the prior servicer. The fees of $7,877.52 were false as the prior servicer, Litton Loan Servicing, LP ("Litton"), did not claim any of those fees while it was servicing the loan.

40. Ocwen's response revealed and/or confirmed several bogus and inflated fees that were assessed on the purported loan. For example, the Property Inspection Fee and

Property Maintenance Fee were redundant and duplicative of each other and there were charges for services that were never performed. Another example, the title fees were inflated and/or overpriced. Some of the more egregious charges were the $3,075 in collection costs and fees and $3,873.90 in publication costs. The collection costs were completely unsubstantiated and the publication costs were either duplicative or severely inflated. Two other patent improper or illegal fees, were the Notice of Sale and Eviction Fee costs, both of which were for services that undisputedly did not occur. There was no sale to be noticed and there was no eviction, so the associated fees were bogus.

41. By letter dated June 22, 2017, Ocwen purported to have provided the documentary information that was requested in Plaintiff's letter. Those documents included a loan payment history for Ocwen that was barely readable due to small print, an illegible payment history for Nationscredit, a nonsensical loan payment history for Litton Loan Servicing, a copy of a Promissory Note with an illegible endorsement, a second copy of the Note with a purported allonge containing an endorsement in blank from Credit Based Asset Servicing and Securitization, LLC, copies of Assignments of Mortgage, Welcome Letter from Ocwen, and invoices from Altisource and Morris Hardwick Schneider.

42. On or about July 24, 2017, Plaintiffs mailed Ocwen a dispute letter claiming a balance error, payments error, fees error and payoff errors. In the letter, the Plaintiffs explained the basis for asserting such errors. Regarding the balance, the Plaintiffs claimed the current balance should have been no more than $185,000, *not* $243,256.67. As for the payment errors, the letter asserted the Plaintiffs' mortgage payments were incorrectly applied because the principal portion of the payments were not credited. With respect to the fee errors, it was stated, in detail, that the prior servicer fees were unsubstantiated and bogus. The letter concluded by asserting the Payoff quotes for 02/06/2017 and 02/16/2017 were

inaccurate because the quotes were based on inaccurate information – balance errors, payment errors and fee errors.

43. Along with the dispute letter, Plaintiffs contemporaneously sent a letter requesting certain information regarding the loan. In this letter, the Plaintiffs requested a certified true and accurate copy of the Note and requested specific information regarding an Assignment of Mortgage dated June 15, 2006. Plaintiffs also requested the Loan Servicing History be produced in a legible and sensible format. Next, Plaintiffs asked for an explanation for Ocwen's failure to send any monthly mortgage statements and requested a mortgage statement or the information contained in the mortgage statement be sent to the Property. In addition, the Plaintiffs asked Ocwen to identify all correspondence that has been sent to the Property, including any written denials of Plaintiffs' loan mod applications.

44. Continuing, the letter had a request for a detail explanation of certain fees and charges, including Civil Litigation Fees, the process server fee, Title Search fees and Tree and Shrub Trimming, Padlock and Meet and Greet fees. With regards to the foregoing sentence immediately preceding, the letter stated there were no trees and shrubs to trim, no padlock was put on the property and there was no Meet and Greet, and therefore, requested the fees be removed. Plaintiffs then asked for a copy of the property valuations and BPOs that were done on the Property. Further, there was a request for a current reinstatement quote and current payoff quote in the Plaintiffs' letter. In conclusion the Plaintiffs asked for copies of the documents Ocwen relied upon to support its response in its letter dated 06/13/2017.

45. On July 28, 2017, Ocwen received Plaintiffs' letter dated July 24, 2017, but did not acknowledge receipt of Plaintiffs' letter until after September 8, 2017, which was well-after 5 days of receiving Plaintiffs' letter.

46. On August 24, 2017, Plaintiff sent Ocwen another letter requesting proof that Ocwen or US Bank was in possession of the original Note. Further, the Plaintiffs noted that

the copy of the Note in Ocwen's and US Bank's First Amended Complaint was a bad copy and requested certain information regarding the illegible endorsement on the Note. The letter also noted that Ocwen's and US Bank's First Amended Complaint alleged that the Temple Mortgage was paid off and requested information on Temple Mortgage's relationship with Bankers Trust Company. Next, Plaintiffs requested Ocwen explain in detail how the foreclosure attorney in 2013 determined the reinstatement amount was $59,570.41 and the full payoff amount was $181,970.57.

47. Plaintiffs additionally asked how the $181,970.57 amount grew to $234,324.39 from August 2, 2013 to July 20, 2017, respectively. Plaintiffs noted that that they believed Ocwen overstated the interest added to the loan and requested Ocwen correct its records by removing the excess interest assessments. Then Plaintiffs referenced the Affidavit of Debt attached to Ocwen's and US Bank's First Amended Complaint and asked for detailed description of Ocwen's calculation of the Escrow Bal/Adv of $19,745.65.[1] Continuing, Plaintiffs requested a calculation of the Accrued Interest of $110.925.66, Fee Billing Balance of $14,718.01. Concluding, the letter claimed the Interest Rate and Per Diem Interest were wrong based on Ocwen's own Affidavit of Debt and requested Ocwen correct the total accrued interest amount.

48. By letter dated September 27, 2017, Ocwen issued its purported response to either Plaintiffs' July 24th letter or Plaintiffs' August 24th letter. Ocwen's letter stated that it had requested a copy of certain documents to be sent to Plaintiffs. Those documents included the Note, Mortgage, Assignment of Mortgage, Welcome letter, Truth in lending document,

[1] Upon information and belief, Ocwen charged Plaintiffs inflated premiums for the fore-placed insurance coverage. In 2014 Ocwen was sued for such practices in a class action complaint representing 400,000 borrowers. That class action complaint was settled for $140 million.

Ocwen also charges its borrowers for real estate property taxes but does not pay the property taxes. In 2017, Ocwen charged Plaintiff for property tax payments but Ocwen did not make any payments on the property taxes in 2017.

Loan Application, Settlement Statement and Amortization Schedule. With regards to the Note, Ocwen stated that it did not have the original Note. More specifically, Ocwen stated "[a]n extensive search was conducted for the physical location of Note and Mortgage through our imaging system, collateral department, and the off-site document storage facility, however the location of Note and Mortgage were unable to retrieve the location through reasonable efforts."

49. Regarding the loan payments, Ocwen stated the loan was a simple interest loan and that the entire payment of interest and principal would only be applied to interest if the Plaintiffs did not make the monthly mortgage payment *prior* to the due date. As for the loan fees, Ocwen stated it acquired the loan with $7,877.52 in fees and that the fees had grown to $14,793.01. Ocwen provided a general description of a Property Inspection Fee, Property Valuation Fee, Title Report Fee and Foreclosure Fees. The general description was not specific to Plaintiffs' loans and did not provide an explanation, much less substantiate the fees charged on Plaintiffs' loans. Furthermore, Ocwen did not provide general descriptions for many of the fees that the Plaintiffs disputed.

50. In a separate mailing, Ocwen sent Mortgage Statement dated 08/22/2017, illegible escrow payment history, invoices, Valuation Services, a copy of the Note without allonge, some Ocwen Mortgage Statements, Litton Loan Mortgage Statements and denial letters for Plaintiffs' loan modification applications. The Litton Loan Mortgage Statements did *not* show *any* loan fees, let alone $7,877.52 of fees. The Loan Mod denial letters stated that the loan owner did not allow loan modifications. The Loan Mod denial letters revealed that Ocwen and/or US Bank were denying Plaintiffs for the HAMP modification all along because the loan owner did not want to modify the loan. Ocwen's last Loan Mod denial letter was disingenuous in that it claimed the HAMP modification was denied because the program

had expired. The copy of the Note did not have the allonge but had an additional page that was not included with the copy of the Note provided by Ocwen in June 2017.

***CFPB LAWSUIT AGAINST DEFENDANT OCWEN***

51. In April 2017, Ocwen was sued by the Consumer Financial Protection Bureau ("CFPB") for, among other things, boarding loans with inaccurate loan information into its servicing system, including inaccurate payment history data that it had reason to believe was inaccurate or incomplete. Even when data was deemed accurate, Ocwen's servicing system, REALServicing, generated errors because of system failures and deficient programming.

52. The CFPB also found that Ocwen failed to verify whether the prior servicers' corporate advances or fees for servicing-related expenses—such as attorneys' fees, property inspection fees, property preservation fees, force-placed insurance charges, and foreclosure-related expenses—were valid and actually owed by borrowers. Continuing, the lawsuit asserted that in many instances, Ocwen charged borrowers for these charges and fees, even though neither Ocwen nor the prior servicer had invoices or other documents to support these charges and fees, and even though Ocwen was receiving disputes from borrowers claiming that these charges or fees were not owed.

53. In December 2014, Ocwen reviewed loans it had boarded the previous year, and determined that it was missing invoices or other documents to support $98 million in corporate advances that it had charged to borrowers, according to the CFPB. In June 2015, Ocwen also learned that it did not have documentation to support $58 million out of $85 million in corporate advances that it had charged to borrowers whose loans it transferred to new servicers. From 2014 through at least April 2016, a significant percentage of the loans it ultimately verified contained errors or incomplete information and required corrections. For example, in April 2014, Ocwen reported that 72 percent of the loans it verified that month contained errors or incomplete information and required corrections in REALServicing. And

in March 2016, 90 percent of the loans Ocwen verified contained errors or incomplete information that required corrections.

***ILLEGAL FORECLOSURE ACTION AND SALE***

54. On July 20, 2017, the Defendants filed an Amended Complaint to Foreclose. Unlike the original Complaint, the Amended Complaint was not verified by Ocwen.

55. Upon information and belief, the Amended Complaint was not verified because Ocwen knew the allegations in the Amended Complaint were false. For example, by letter dated September 27, 2017, Ocwen admitted that the Defendants were not in possession of the Note, and therefore, Ocwen knew that none of the Defendants qualified as a "holder" of the Note.

56. At a status hearing on September 1, 2017, the Superior Court set the foreclosure action on a Track 2 and issued a scheduling order, which set, among other dates, the close of discovery and dispositive motion deadline for January 16, 2018 and February 12, 2018, respectively. No foreclosure sale could occur until after the dispositive motions were filed and the Court found in the favor of US Bank.

57. Plaintiff filed a motion to dismiss on the basis that the Amended Complaint did not allege that the Plaintiff it was in possession of the Note, let alone that it was in possession of the Note at the time of filing the lawsuit.

58. On September 8, 2017, BWW filed an opposition to the Plaintiff's motion to dismiss wherein BWW represented that US Bank was in possession of the Note.

59. The Court denied the Plaintiff's motion to dismiss the Amended Complaint to Foreclose on September 29, 2017 and the Plaintiffs filed their Answer to the Amended Complaint to Foreclose on October 19, 2017.

60. On or about October 23, 2017, the Plaintiffs learned that the Defendants had scheduled a foreclosure sale of the Property for November 20, 2017 at 12 pm (noon).

61. The Defendants had no legal right to conduct a foreclosure sale for the foreclosure case was only in the discovery period and no dispositive motions had been filed, much less had the Court ruled favorably for the Defendants on a dispositive motion.

62. Despite Plaintiffs protest to the sale, the Defendants did not agree to cancel the sale until November 6, 2017.

63. Under the threat of a foreclosure sale of her home, Plaintiff Newman was under severe emotional distress and became physically sick.

64. On or about December 14, 2017, during the discovery period, the Plaintiff asked the Defendants to produce the original Note, but the Defendants were not able to produce the original Note.

65. Defendant BWW stated that it requested the Plaintiff to produce the original Note but never received it.

66. BWW's acknowledgment that it had to request the Note from US Bank was an admission that BWW was not in possession of the Note and did not know the whereabouts of the Note.

67. BWW's admission that it is not in possession of the Note, is an admission that the Defendants had no standing to initiate or maintain the foreclosure action.

68. According to the CFPB, Ocwen has a history of conducting wrongful foreclosure sales. In an investigation, the CFPB found that Ocwen failed to implement mandated foreclosure protections, wrongfully initiated foreclosure proceedings on at least 1,000 people, and wrongfully held foreclosure sales.

***OCWEN'S FRAUDULENT REPRESENTATIONS***

69. Ocwen often cannot identify the true creditor or provide any documentation demonstrating who owns the loan. Ocwen then resorts to fabricating documents and obfuscation to keep the borrower in the dark until they can successfully foreclose. To

overcome these issues Ocwen either photoshopped endorsements or assignments in-house, or went to a third party who creates fraudulent loan instruments and filed to foreclose.

70. The so-called "original" copies submitted by Ocwen are nothing more than computer-generated forgeries and such fraud would be discovered if the loan documents (i.e. Note and Assignment) were sent to a forensic document fraud examiner.

71. In many instances, Ocwen employees execute a "corrective" assignment to purportedly assign mortgages and loans for other loan owners or servicers.

72. There have been instances where Ocwen employees describe their job duties to include researching mortgage documents to verify a full chain of title is present and to create documents as needed or if necessary to create a proper full chain of title.

73. Ocwen's recreation of chain of assignment with fabricated documents to create the appearance of standing is an act of fraud. Ocwen's fabricated copies of the note and assignment do not document an actual transaction (sale, transfer) and are nothing more than window dressing to create the illusion an event occurred.

**COUNT ONE: VIOLATIONS OF FDCPA**
**(as to Defendants BWW and Ocwen)**

74. Plaintiffs incorporate paragraphs 1 - 73 by reference.

75. Defendants violated 15 U.S.C. §1692e(2),(5),f(1) by collecting, attempting to collect and/or threatening to collect an inflated principal balance and cure amount in part, *among other things*, due to failing to credit the principal portion of the loan payments, assessing unsubstantiated fees, inflated or excessive fees, redundant or duplicative fees, and fees for services or actions that never occurred.

76. Defendants violated §1692e(10) by falsely representing to be in possession of the Note, falsely representing that the fabricated allonge was legitimately affixture to the Note, and falsely representing a right to collect on the debt and foreclose on the Property.

77. Defendants violated §1692e(2),(5) and f(6) by misrepresenting the status of the foreclosure action and threatening to sell the Property at a public auction when they had no legal right to sell the Property.

78. Defendants' violations caused the Plaintiff to endure damages including out-of-pocket costs, legal fees defending the illegal foreclosure, fear of losing the Property, worry about where her loved ones will live, anxiety about losing the family home, very heavy stress, severe headaches and stomach aches, sleepless nights, eating disorders, excessive worry, mental and emotional distress.

79. Defendants' conduct was the proximate cause of Plaintiffs injuries, rendering BWW and Ocwen liable for actual damages in an amount to be determined by the jury pursuant to 15 U.S.C. §1692k(a)(1), statutory damages pursuant to 15 U.S.C. §1692k(a)(2)(A), and reasonable attorney's fees pursuant to 15 U.S.C. §1692k(a)(3).

**COUNT TWO: FDCPA CLASS CLAIM**
**(as to Defendants BWW and Ocwen)**

80. Plaintiffs incorporate paragraphs 1 - 79 by reference.

81. 15 U.S.C. §1692e provides that

> A debt collector may not use any false, deceptive, or misleading representation or means in connection with the collection of any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section....
>
> (2) The false representation of –
>
> (A) the character, amount, or legal status of any debt....

82. 15 U.S.C. §1692f provides that

> A debt collector may not use unfair or unconscionable means to collect or attempt to collect any debt. Without limiting the general application of the foregoing, the following conduct is a violation of this section....
>
> (1) The collection of any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless such amount is expressly authorized by the agreement creating the debt or permitted by law....

Class Action Allegations

83. Plaintiff seeks to maintain this action as a class action representing a class consisting of the following:

FDCPA Eviction Fee Class

All individuals who, within one year of the filing of this complaint, have had their mortgage loan account assessed with an Eviction Fee and Ocwen and/or BWW sent communications attempting to collect the Eviction Fee when no eviction proceedings had been initiated or no eviction fees had been incurred.

FDCPA Notice of Sale Class

All individuals who, within one year of the filing of this complaint, have had their mortgage loan account assessed with a fee for a Notice of Sale and Ocwen and/or BWW sent communications attempting to collect a fee for a Notice of Sale when no sale was scheduled or costs were incurred providing notice of a sale.

FDCPA Escrow Payment Class

All individuals who, within one year of the filing of this complaint, have been charged for an escrow payment to real estate property taxes when Ocwen did not make a corresponding payment on the property taxes.

84. *Ascertainability/Numerosity*: The class is ascertainable in that it is comprised of individuals who can be identified by reference to purely objective criteria. There are hundreds, if not thousands of members of the class and, therefore, it would be impracticable to bring all, or even a substantial percentage of, such persons before the Court as individual plaintiffs.

85. *Typicality*: The claims of the named plaintiff are typical of the claims of each member of the class he seeks to represent because: (1) they have all been injured in the same manner as a result of Defendants illegal assessments and debt collection; and (2) their claims are all based on the same legal theory.

86. *Adequacy Of Representation*: Plaintiff is an adequate representative of the class she seeks to represent because: (a) she is willing and able to represent the proposed

class and has every incentive to pursue this action to a successful conclusion; (b) her interest is not in any way antagonistic to those of the other class members; and (c) she is represented by experienced and competent counsel.

87. *Commonality*: There are questions of law and fact common to all members of the Class. The overarching questions of law and fact that are common to all members of the class are whether:

(a) Defendants assessed a fee for an eviction or notice of sale;

(b) Defendants did not incur a cost for an eviction or notice of sale;

(c) Defendants assessed a charge for paying property taxes;

(d) Defendants did not pay property taxes;

(e) Defendants attempted to collect a fee for an eviction or notice of sale;

(f) Defendants attempted to collect a payment for property taxes;

(g) Defendants attempt to collect a payment for an eviction, notice of sale or unpaid property tax violated Defendants requirements of 15 U.S.C. §1692(e)&(f).

88. Class certification of plaintiff's claims is appropriate because Defendants have acted and/or refused to act on grounds generally applicable to the class, thereby making declaratory and final injunctive relief appropriate. Such generally applicable grounds consist of Defendants conduct in the assessment or charges of fees that were not incurred and attempting to collect on those fees.

89. The class action vehicle is superior to other available methods for the fair and efficient adjudication of these claims. For the vast majority of members of the class, the members of the class are likely to be unaware of their rights and if they were aware, the amount of any potential recovery is too small to justify the cost of prosecuting their claims individually, despite the availability of costs and attorney fees in the event they were to

prevail on the merits. Further, requiring each class member to pursue his or her claim individually would entail needless duplication of effort, would waste the resources of both the parties and the Court, and would risk inconsistent adjudications. Congress intended class actions to be the principal enforcement mechanism under the FDCPA.

90. Defendants sent letters demanding money for fees—eviction fee and notice of sale fee—that were *not* incurred and *not* authorized from the Named Plaintiff and Class members.

91. Defendants' illegal attempts to collect unauthorized and undue fees violated the Named Plaintiff and Class members' rights under 15 U.S.C. §§1692e and 1692f.

92. As a result of Defendants' noncompliance with the requirements of 15 U.S.C. §§1692e and 1692f, the Named Plaintiff and Class members are entitled to statutory damages pursuant to §1692k(a)(2)(A) and reasonable attorney's fees pursuant to §1692k(a)(3).

**COUNT THREE: VIOLATIONS OF RESPA**
**(as to Defendant Ocwen)**

.

93. Plaintiffs incorporate paragraphs 1 - 92 by reference.

94. Plaintiffs' loan is a federally related mortgage loan as defined by RESPA.

95. Defendant Ocwen is a servicer as defined by RESPA because it is responsible for the collection of periodic payments and applying those payments to the loan account.

96. J.D. Powers ranks Ocwen as the mortgage servicing company with the absolutely worst customer service and accountability. (www.jdpower.com/press-releases/jd-power-2016-primary-mortgage-servicer-satisfaction-study).

97. Ocwen claims to be responsible for servicing Plaintiffs' loan and was purportedly servicing the loan when Plaintiffs' submitted their written inquiries and applied for a loan modification.

98. Within three years of filing this instant complaint, Plaintiff Vivian Newman submitted a facially complete loss mitigation application more than 37 days prior to a scheduled foreclosure sale or Plaintiffs received a belated written response to their loan modification application.

99. Ocwen was obligated by the Code of Federal Regulations, 12 C.F.R. § 1024.41, and by extension RESPA, to provide a substantive response to Plaintiffs loan modification application(s), and specifically, to identify investor restrictions that prohibit a loan modification.

100. Ocwen was further obligated under RESPA to acknowledge Plaintiffs' written inquires (i.e. qualified written request ("QWR"), notice of error ("NOE") or request for information ("RFI"), and to respond substantively within 30 days of the date the written inquiry was received.

101. In denying the loan modification application, Ocwen failed to identify the applicable investor restrictions that prohibited Plaintiffs from obtaining a loan modification.

102. Ocwen further failed to provide a substantive response to Plaintiffs' written inquiries by failing to answer servicing-related questions or mortgage-related questions with respect to efforts undertaken to persuade the investor to approve a loan HAMP modification.

103. Ocwen also failed to timely respond to the Plaintiffs' written inquiries as required by RESPA.

104. The numerous RESPA violations detailed in this Complaint constitute a pattern and practice of noncompliance.

***RESPA'S VIOLATIONS RELATING TO PLAINTIFFS' LOAN MODIFICATION APPLICATION.***

105. Under Regulation X, if a servicer receives a loss mitigation application, which is an oral or written request for a loss mitigation option that is accompanied by any

information required by a servicer for evaluation for a loss mitigation option, from borrowers whose mortgage is secured by their principal residence, certain protections are triggered.

106. Ocwen violated §2605(f) by failing to exercise reasonable diligence in completing Plaintiff's loss mitigation application See 12 C.F.R. § 1024.41(b)(1).

107. Ocwen violated §2605(f) by failing to notify the Plaintiffs in writing within 5 days after receiving Plaintiff's loss mitigation application that Ocwen acknowledged receipt of the application and that Ocwen had determined that the application was either complete or incomplete. See 12 C.F.R. § 1024.41(b)(2).

108. Ocwen violated §2605(f) by failing to evaluate the borrower for *all* loss mitigation options available to the Plaintiffs and provide Plaintiffs with written notice that it will or will not offer Plaintiff loss mitigation options. See 12 C.F.R. § 1024.41(c)(1).

109. Ocwen violated §2605(f) by failing to provide the Plaintiff with the specific reason or reasons for denying her loan modification. See 12 C.F.R. § 1024.41(d)(1).

110. Ocwen violated §2605(f) by failing to provide the Plaintiff with written notice of Plaintiffs right to appeal the denial of any loan modification. See 12 C.F.R. § 1024.41(c)(1)(ii)&(d)(2).

111. Ocwen violated §2605(f) by failing to permit Plaintiff to appeal Seterus' determination to deny Plaintiff's loss mitigation application. See 12 C.F.R. § 1024.41(h).

112. Plaintiffs have incurred damages as a result of Ocwen's foregoing actions. Plaintiffs have expended or been charged in excess of $1,000.00 per month in upkeep on the Property, including mortgage payments, yard maintenance, electric and water bills, and other miscellaneous repairs. To date, Plaintiffs have incurred over $40,000.00 in such damages.

113. Plaintiffs would not have incurred these damages but for Ocwen's failure to provide the information that Plaintiffs sought because Plaintiffs would not have continued to

incur these expenses if they had been made aware of the futility of obtaining a loan modification.

***RESPA'S VIOLATIONS RELATING TO PLAINTIFFS' WRITTEN INQUIRIES – QWR, NOE & RFI.***

114. Plaintiffs' written inquiries were letters that contained the name on the loan account and the account number for the account, was written on a piece of paper that was not from Ocwen, pertained to the loan or the servicing of the loan, and notified Ocwen of an error or requested information from Ocwen.

115. As of January 10, 2014, Section 6(e)(2) and (k)(1)(c) of RESPA, 12 U.S.C. §§2605(e)(2) and (k)(1)(c), requires Ocwen to conduct an investigation of a qualified written request and make appropriate corrections to a consumer's account. Regulation X further explains that a qualified written request that asserts an error relating to the servicing of a mortgage loan is a notice of error ("NOE") and that a servicer generally must either: (1) correct the error or errors identified by the borrower and provide the borrower with a written notification regarding the correction; or (2) conduct a reasonable investigation of an alleged error and provide the borrower with a written notification that indicates that the servicer has determined no error occurred and provides additional required information. 12 C.F.R. § 1024.35(a) and (e)(1).

116. Ocwen violated 12 U.S.C. §2605(e)(2)(A)-(C) by failing to take appropriate action, including conducting a reasonable investigation of Plaintiffs' inquiries and correcting any errors that were reasonably discoverable, and conducting a reasonable investigation and providing the Plaintiffs with the requested information or an explanation of why the information was not available.

117. Ocwen violated §2605(k)(1)(D) by failing to provide Plaintiff with the identity of the true owner of the loan within 10 business days of Plaintiffs' request for such information.

118. Ocwen violated §2605(e),(f) by failing to respond within 7 days of Plaintiff's inquiry regarding payoff balance, loss mitigation options and foreclosure. See 12 C.F.R. § 1024.35(e)(3)(i)(A).

***CFPB v. Ocwen Financial Corp, Inc.,***
***Case No. 9:17-cv-80495 (S.D. Fla. Apr. 20, 2017)***

119. The Consumer Financial Protection Bureau took action citing Ocwen for failing borrowers at every stage of the mortgage servicing process.

120. Since 2014, Ocwen has routinely failed to reasonably investigate, and, when appropriate, make corrections in response to borrower complaints and notices of errors, said the CFPB. These failures have caused serious harm to consumers.

121. In numerous instances since January 10, 2014, the CFPB found that Ocwen had failed to make appropriate corrections relating to NOEs when it finds errors in borrowers' accounts, and has failed to conduct reasonable investigations of NOEs.

122 According to the CFPB, Ocwen has failed to implement policies and procedures that are reasonably designed to meet the consumer complaint handling objectives to respond, investigate, and, where appropriate, correct errors.

123. CFPB's lawsuit alleged that Ocwen's policies and procedures have not been reasonably designed to ensure that its personnel conduct reasonable investigations of the alleged error in complaints. Ocwen's policies and procedures, for instance, direct Ocwen personnel to rely on the information in REALServicing to investigate complaints. Thus, Ocwen's ability to appropriately investigate complaints is largely dependent on the accuracy of the information contained within REALServicing. Further, Ocwen's policies and

procedures provide little to no guidance to personnel on how to document the step-by-step basis for their conclusions regarding the validity of an alleged error.

124. Continuing, CFPB asserted that Ocwen's policies and procedures providec little or no guidance to personnel about how to correct errors. For example, Ocwen's policies and procedures do not detail what factors personnel should consider when recommending remediation, including what types of harms and downstream impacts to borrowers they should consider. At best, Ocwen's policies and procedures identify certain forms of remediation such as fee waivers and credit reporting corrections, but do not inform personnel when these or other forms of remediation are appropriate. Without such guidance, Ocwen personnel are left to their own discretion to determine whether an error has occurred, and, if so, how to correct the error.

125. As a result of Ocwen's above policies and procedures, which also apply to NOEs, the CFPB found that Ocwen failed to conduct reasonable investigations and/or, where appropriate, make corrections of errors in borrowers' complaints and NOEs. Among other things, Ocwen has relied on inaccurate data in REALServicing, and the Ocwen personnel who investigate borrowers' complaints and NOEs are not required to cross-reference Ocwen's known and documented systemic errors, such as the payment processing and application, escrow, and insurance errors, and thus do not consider that information in their investigations. Further, in responding to certain complaints and NOEs, Ocwen has simply parroted back the information in REALServicing, including details set forth in payment and escrow histories, without addressing the errors presented by borrowers.

126. Additionally, CFPB found that Ocwen routinely failed to properly acknowledge and investigate complaints, or make necessary corrections. More specifically, Ocwen stated that in April 2015 Ocwen failed to address the difficulty its call center had in recognizing and escalating complaints. Under its new policy, borrowers must complain at

least five times in nine days before Ocwen automatically escalates their complaint to be resolved. Since April 2015, Ocwen has received more than 580,000 notices of error and complaints from more than 300,000 different borrowers.

***DAMAGES FOR OCWEN'S RESPA'S VIOLATIONS RELATING TO PLAINTIFFS' WRITTEN INQUIRIES AND LOAN MODIFICATION APPLICATION(S).***

127. Upon information and belief, Ocwen's conduct is not just limited to the Plaintiff, but Ocwen has committed similar violations against other borrowers of loans to which Ocwen services, and constitute a "pattern or practice" of noncompliance with the requirements of 12 U.S.C §2605.

128. Ocwen's violations against Plaintiffs are numerous and consistent, constituting a "pattern or practice" of noncompliance with the requirements of 12 U.S.C §2605. This allegation is substantiated by the CFPB's finding that Ocwen, in numerous instances, failed to maintain policies and procedures reasonably designed to ensure that it is investigating, responding to, and, as appropriate, making corrections in response to complaints asserted by a borrower.

129. As a result of the conduct, actions and inactions of Ocwen, Plaintiff suffered actual damages, including pecuniary damage and emotional and mental distress.

130. Ocwen's conduct was the proximate cause of Plaintiffs' injuries, rendering Ocwen liable for actual damages in an amount to be determined by the jury pursuant to 12 U.S.C. §2605f(1)(A), statutory damages pursuant to 12 U.S.C. §2605f(1)(B), costs and reasonable attorney's fees pursuant to 12 U.S.C. §2605f(3).

**COUNT FOUR: VIOLATIONS OF ECOA**
**(as to Defendants Ocwen and US Bank)**

131. Plaintiff incorporates the preceding allegations by reference.

132. Plaintiff Ms. Vivian Newman is an "applicant" as defined by the ECOA, 15 U.S.C. §1691a(b).

133. Defendants Ocwen and US Bank are "creditors" as defined by the ECOA, 15 U.S.C. §1691a(e).

134. 15 U.S.C §1691(d)(1) provides that "within thirty days…after receipt of a completed application for credit, a creditor shall notify the applicant of its action on the application."

135. The accompanying Regulation B, issued by the Board of Governors of the Federal Reserve System pursuant to ECOA, further provides: "A creditor shall notify an applicant of action taken within: (i) 30 days after receiving a completed application concerning the creditor's approval of, counteroffer to, or adverse action on the application." 12 C.F.R §202.9(a)(1)(i).

136. The term "credit" means the right granted by a debtor to defer payment of a debt or to incur debts and defer its payment…and defer payment thereof. 15 U.S.C. §1691a(d); 12 C.F.R. §202.2(j).

137. Plaintiff's loss mitigation application sought, among other things, a loan modification, which is an application for "credit" as defined by §1691a(d); §202.2(j).

138. Plaintiff provided Defendants with a completed application for credit.

139. Defendants failed to evaluate the Plaintiff's loan modification request in good faith and a make any determination on the applications after receiving the completed loan modification applications.

140. In failing to evaluate the Plaintiff's application for credit in a manner required by the federal and state regulations, Defendants effectively denied the Plaintiff, and thereby took "adverse action" – as defined by ECOA – on the Plaintiff's application.

141. Plaintiff did not receive any written notice or did not receive timely written notice from Defendants of the adverse action taken on her loan modification applications.[2]

142. Defendants' failure to notify Plaintiff of the adverse actions taken on her application within thirty days from receipt of her completed application for credit as mandated by 15 U.S.C §1691(d)(1) and 12 C.F.R §202.9(a)(1)(i) was a substantive violation of ECOA.

143. Defendants willfully violated the ECOA, 15 U.S.C. §1691(d).

144. As a result of the above ECOA violations, the Plaintiff has suffered substantial actual damages in the following:

a. the loss of the Plaintiff's right to explain or quickly rectify and address any errors or problems in her applications for credit;

b. the assessment of extra fees and charges by Defendants that accrued due to their delay in responding the Plaintiff's requests for credit;

c. the loss of the credit itself; and

d. frustration, anger, humiliation, fear, embarrassment and other emotional and mental anguish.

145. As a result of the above alleged ECOA violations, Defendants are liable to the Plaintiff for actual damages pursuant to 15 U.S.C. §1691(e)(a), for punitive damages against Defendants pursuant to 15 U.S.C. §1691e(b) and for attorneys' fees and costs pursuant to 15 U.S.C. §1691(e)(d) and 12 C.F.R. §202.16(b).

**COUNT FIVE: VIOLATIONS OF TILA**
**(as to Defendant and US Bank)**

146. Plaintiffs incorporate paragraphs 1 - 145 by reference.

[2] In 2017 Ocwen provided denial letters dated prior to 2017. None of these letters were received during the time period that they are dated.

147. Within one year of filing this complaint the Defendants US Bank and Ocwen violated TILA, 15 U.S.C. §1638(f) by failing to transmit any periodic mortgage statements to the Plaintiffs.

148. Consequently, the Plaintiffs did not know the Defendants were claiming a debt against the Property and the Plaintiffs had no idea how much the Defendants' claim was against the Property.

149. Because the Plaintiffs did not know about the Defendants' purported claim against the Property, the Plaintiffs did not make any arrangements to investigate the claim, to pay the debt or to sell the Property.

150. The CFPB also found that, in numerous instances since January 10, 2014, Ocwen has failed to send borrowers periodic statements accurately detailing information such as the amount due, how Ocwen will break down and apply monthly payments, all payments received since the last statement, the total of all payments received since the beginning of the current calendar year, all transaction activity since the last statement, and the amount of payments in a suspense or unapplied funds account.

151. Additionally, the Plaintiffs have incurred costs seeking to obtain the mortgage information required in the periodic statements

152. As a result of the aforesaid TILA violation, the Defendants are liable for:

a. Actual damages including emotional damages and pecuniary costs in an amount to be determined at trial pursuant to 15 U.S.C. §1640(a)(1);

b. Additional statutory damages in the amount of $400.00 to $4,000 for each TILA violation pursuant to 15 U.S.C. §1640(a)(2)(A)(iv); and

c. Reasonable attorneys' fees and the costs of litigation pursuant to 15 U.S.C. §1640(a)(3).

**COUNT SIX: VIOLATIONS OF MLBA**

**(as to Defendants Ocwen and US Bank)**

153. Plaintiffs incorporate paragraphs 1 - 152 by reference.

154. Defendants schemed to defraud Plaintiffs out of the equity in the Property. Defendants mislead the Plaintiff into believing that the Defendants had rights in the Note and unfairly and deceptively assessed fees, charges and costs on against Plaintiffs for a Loan that the Defendants had no right to collect on.

155. Defendants' foregoing illegal actions violated D.C. Code §§26-1114(d)(1),(2).

156. Plaintiffs are seeking damages and/or restitution in an amount of $250,000 and any reasonable attorney fees incurred to litigate this action for Defendants' violations of MLBA under D.C. Code §26-1118(e).

**COUNT SEVEN: VIOLATIONS OF CPPA**
**(as to Defendants Ocwen and US Bank)**

157. Plaintiffs incorporate paragraphs 1 - 156 by reference.

158. Defendants made statements that misrepresented its rights in the Property, Note and Deed of Trust, and Defendants' misrepresentations tended to mislead Plaintiffs into believing that the Defendants had rights to in the Property, Note and Deed of Trust.

159. Defendants made statements that they had rights to collect interest, fees, charges, costs and expenses when the Defendants had no right to collect. Plaintiffs were misled by these misrepresentations and tended to believe Defendants had a legitimate basis for their claims.

160. Defendants failed to state that none of them were a holder of the Note and none of them had a right to collect payments from Plaintiffs. Defendants' omission caused Plaintiffs to believe that they may have had some right to collect payment under the Note.

161. Defendants made statements that they would sell the Property as a foreclosure sale, when the court had not permitted the sale and no right existed to hold the sale. Plaintiffs

were misled by these misrepresentations and tended to believe Defendants were going to sale the Property at a foreclosure sale.

162. Defendants' foregoing illegal actions violated D.C. Code §§28-3904(e) and (f) by misrepresenting material facts that have a tendency to mislead and failing to state material facts of which such failure tended to mislead.

163. As a result of the aforesaid CPPA violations, Defendants are liable for: treble damages, or $1,500 per violation pursuant to §28-3904(k)(2)(A); punitive damages in the amount of $500,000 pursuant to §28-3904(k)(2)(C); and any reasonable attorney fees incurred in the litigation of this action pursuant to §28-3904(k)(2)(B).

**WHEREFORE**, Plaintiff respectfully prays:

A. That the actions and/or communications of Defendants complained of herein be determined and adjudged to be in violation of the rights of Named Plaintiff and Class members under the FDCPA;

B. That the Court enter an Order certifying all of the claims of the Class;

C. That in accordance with 15 U.S.C. 1681k(a)(2), judgment be entered in favor of Named Plaintiff and the Class, either individually or class-wide, and against Defendants for statutory damages in amounts to be determined at trial;

D. That in accordance with 15 U.S.C. 1681k(a)(3), Named Plaintiff and the Class be awarded the costs of this action together with reasonable attorney's fees as the Court may determine;

E. That the Court enter an order approving an incentive award in the amount of $15,000 to $25,000 for the Named Plaintiff;

F. That the Court award $1,000,000 in actual damages for Counts I thru VII;

G. That the Court award maximum statutory damages for Counts I-III, V & VII;

H. That the Court award maximum punitive damages for Count IV;

I. That the Court award costs and any reasonable attorneys' fees; and

J. That the Court award any such other and further legal and equitable relief as may be found appropriate and as the Court may deem equitable and just.

**DEMAND FOR TRIAL BY JURY**

164. Plaintiffs hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

WASHINGTON LEGAL GROUP, LLC

/s/ Jeffrey W. Styles
Jeffrey W. Styles, Esq., Bar #475264
Washington Legal Group, LLC
1150 Connecticut Ave NW – 9th Floor
Washington, District of Columbia 20036
Telephone: (202) 503-1708
Facsimile: (202) 503-1701
E-mail: jstyles@washlegal.com
*Counsel for Defendants*